## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| BRUCE GARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:06-cv-01238-JEO |
| | ) | |
| TRANS-CYCLE INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the motions for summary judgment (doc. 14)[1] and to

strike (doc. 18) filed by Trans-Cycle Industries, Inc. (hereinafter "TCI" or "the defendant").

Based upon a review of the record, including the pleadings, briefs, and evidentiary submissions

of the parties, the court finds that the defendant's motion to strike is due to be granted in part and

denied in part and the motion for summary judgment is due to be granted.

## PROCEDURAL BACKGROUND

Bruce Garrett (hereinafter "Garrett" or "the plaintiff") filed his complaint on June 23,

2006, alleging that the defendant discriminated against him on the basis of his race (African-

American) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, *et seq*. ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.

(Doc. 1).  The complaint alleges a right to recovery for discriminatorily failing to promote,

retaliation, a hostile work environment, and for constructive discharge.  *Id*.  The defendant has

filed a motion for summary judgment (doc. 14) and an accompanying brief ("Def. Brief" (doc.

---

[1]References herein to "Doc. ___" are to the electronic document numbers assigned the pleading by the Clerk of the
Court.

16)).  Included with the motion for summary judgment, as exhibits, are the affidavits of Paul Eddins and Doug Church, the plaintiff's deposition, the plaintiff's personal employee file, and the records of monthly safety meetings.  (Doc. 14).  The plaintiff filed a response in opposition to the motion.  ("Pl. Response" (Doc. 17)).  Following submission of the plaintiff's response, the defendant filed its reply brief ("Def. Reply" (doc. 19)) and a motion to strike portions of the plaintiff's deposition (doc. 18).  The plaintiff did not file a reply to the motion to strike.

## FACTS

The plaintiff is an African-American male who first became employed with TCI in Pell City, Alabama, on September 14, 1994.  (Garrett Dep. at p. 46).[2]  TCI is in the business of dismantling and recycling electrical equipment contaminated by polychlorinated biphenyl ("PCB").  (Eddins Aff. at ¶ 3; Church Aff. at ¶ 4).[3]  PCBs are highly toxic and are believed to be a carcinogen.  *Id.*  Any hazardous wastes that may contain more than 50 parts per million of PCBs are subject to regulation under the Toxic Substances Control Act.  *Id.*  Garrett was employed at TCI, where he dismantled transformers.  (Garrett Dep. at pp. 63-64).  At the beginning of his employment, the facility had around 200 employees.  *Id.* at p. 87.  By the time Garrett left, there were about 36 employees remaining.  *Id.* at p. 88.  Employees of TCI are predominantly African-American.  (Church Aff. at ¶ 3; Garrett Dep. at p. 88).

There are two dismantling crews at TCI.  The "Over 500 Crew" dismantles transformers that contain over 500 parts per million of PCBs.  (Garrett Dep. at p. 65).  The "Under 500 Crew" dismantles transformers that contain less than 500 parts per million of PCBs.  *Id.*  Because the

---

[2]The plaintiff's deposition is located at document 14, exhibit C.

[3]The affidavits of Paul Eddins and Doug Church are located at document 14, exhibits A & B, respectively.

PCB level is higher, employees working in the facility's over 500 parts per million PCB shop are required to wear protective clothing.  *Id*. at pp. 65-66.  Employees working in the facility's under 500 parts per million PCB shop generally do not wear protective clothing.  *Id*.  Garrett worked in the "Over 500 Crew" for about six years.  (Garrett Dep. at p. 67; Church Aff. at ¶ 8).

Around 1995, Doug Church (hereinafter "Church"), a white male, was employed at TCI as the superintendent.  (Garrett Dep. at pp. 95-96).  Church had supervisory authority over Garrett.  *Id*.  In 2005, three out of five TCI supervisors were African-American.  (Garrett Dep. at pp. 126-28; Church Aff. at ¶ 3).  All three African-American supervisors had started their employment at entry-level positions.  *Id*.  Church had promoted each to supervisory positions based upon the employee's individual merit.  *Id*.

All TCI employees were required to undergo regular health screenings by a physician.  (Garrett Dep. at p. 67; Church Aff. at ¶ 8).  On March 14, 2002, a regular health screening revealed that Garrett had elevated levels of PCBs in his blood, and Church transferred Garrett to the "Under 500 Crew."  (Garrett Dep. at p. 68; Church Aff. at ¶ 9; Eddins Aff. at ¶¶ 8-9) .  Later, Garrett was placed in charge of the "lead room" to run a machine therein.  (Garrett Dep. at p. 72).  The PCB levels in the "lead room" are significantly lower than those in the over 500 shop.  (Eddins Aff. at ¶ 10).  However, Garrett had reason to believe that the PCB levels in the "lead room" also were high.  (Garrett Dep. at p. 72).  Garrett believes that TCI wanted him to run the "lead room" because he was a strong worker.  *Id*. at p. 85.  He wore protective clothing and continued his regular health screenings.  (*Id*. at p. 75).

In accordance with its established health policy, TCI continued to monitor PCB levels in Garrett's blood.  (Eddins Aff. at ¶ 9; Church Aff. at ¶ 9).  Subsequent blood tests revealed that

Garrett's PCB levels were significantly reduced from 2002, after Garrett was transferred out of the "Over 500 Crew," until the time that he left his employment with TCI.  *Id.*

Because work in the "lead room" is intermittent and temporary in nature (Eddins Aff. at ¶ 10), when work ran out, Garrett was transferred back to the disassembly line in the "Under 500 Shop."  (Garrett Dep. at p. 84).  Due to a reduced workload, the number of employees at TCI was significantly reduced in 2004 and 2005.  (Church Aff. at ¶ 10).

In 2004 and 2005, Garrett was part of the "Under 500 Crew" disassembling pole mounts and transformers.  (Garrett Dep. at p. 84; Eddins Aff. at ¶ 11; Church Aff. at ¶ 13).  The "Under 500 Crew" consisted of six African-American employees, including Garrett, and one Caucasian employee.  (Garrett Dep. at pp. 156-58; Eddins Aff. at ¶ 11; Church Aff. at ¶ 30).

In 2004, TCI employed two full-time oil tank pumpers, Antonio Rowland (hereinafter "Rowland") and Kevin Ellis (hereinafter "Ellis"), both African-American employees.  (Garrett Dep. at pp. 129-30, 132; Church Aff. at ¶ 14).  Both Rowland and Ellis had been promoted to the oil tank pumper positions from lower-paying jobs.  (Garrett Dep. at p. 135).  In June 2004, Ellis resigned from his oil tank pumper position to take another job.  (Garrett Dep. at p. 132; Church Aff. at ¶ 14).  TCI offered the Oil Tank Pumper position to Jeremy Adams (hereinafter "Adams"), a white college student, to work 30 to 32 hours per week.  (Church Aff. at ¶¶ 15, 17).  TCI contends that there was insufficient work for a second full-time oil tank pumper.  *Id.*  Garrett contends that Adams was hired because of his race, not because of the lower workload.  (Pl. Response at 3).  At the time, Adams was dating Church's daughter.  (Garrett Dep. at p. 138).

In April 2005, Rowland, the full-time oil tank pumper notified TCI that he was leaving for another job.  (Garrett Dep. at p. 132; Church Aff. at ¶ 18).  Upon receiving Rowland's notice,

Church consulted with the supervisor of the oil tank pumpers, Vernon Ogle, a white employee, and the supervisor of the "Over 500 Shop," Ben Garrett, an African-American employee. (Church Aff. at ¶ 18).  Since the work of the "Over 500 Crew" had been declining annually, there was no longer a need for the same number of employees in the over 500 shop.  *Id*. at ¶ 19. Phillip Sweet (hereinafter "Sweet"), a Caucasian employee assigned to the "Over 500 Crew" and who was qualified for the oil tank pumper position, was offered the full-time oil tank pumper position.  (Garrett Dep. at pp. 130, 136; Church Aff. at ¶ 21).  Sweet's vacant position on the "Over 500 Crew" was not filled.  (Church Aff. at ¶ 21).

Before Church became superintendent, TCI posted job openings so that employees could submit their bids and/or applications for positions.  (Garrett Dep. at pp. 276-77).  After Church became superintendent, the two job openings for Oil Tank Pumper were not posted.  *Id*. at p. 277. TCI contends that this was done to avoid having to lay off existing employees and to promote productivity.  (Church Aff. at ¶ 22).  Garrett was not allowed to bid, apply, and/or train for either of the two Oil Tank Pumper jobs.  (Garrett. Dep. at pp. 46, 130, 277).  Garrett had over 11 years of experience at TCI.  *Id*.  Garrett never requested a promotion during his employment nor did he tell anybody that he wanted to train for an Oil Tank Pumper position.  (Garrett Dep. at pp. 142, 145; Church Aff. at ¶ 26).

Since TCI employees handle chemicals which are potentially life-threatening, TCI considered any disruption, threat, or violence between employees to be extremely serious. (Eddins Aff. at ¶ 7; Church Aff. at ¶ 6).  Because of the toxicity and potential danger presented to employees by the handling of PCBs, safety is a high priority at TCI.  (Eddins Aff. at ¶ 6; Church Aff. at ¶ 5).  TCI conducts regular safety meetings to stress and reinforce policies and procedures

5

regarding employee safety.  (Garrett Dep. at pp. 101, 104-05, 256, 303, 318-19; Eddins Aff. at ¶ 6; Record of Training from 2/11/2004 Monthly Safety Meeting; Record of Training from 10/7/2004 Monthly Safety Meeting).  These meetings include discussions of horseplay in a working environment and violence in the workplace.  *Id*.  Garrett admitted that TCI conducted safety meetings more or less monthly and that he attended safety meetings on February 10, 2004, and October 7, 2004, where these issues were addressed.  (Garrett Dep. at pp. 101, 102, 105).

In April 2005, after reports to management that employees of the "Under 500 Crew" had made threatening remarks and were arguing, TCI organized an employee safety meeting to discuss violence and disruption in the workplace and attendant safety issues.  (Eddins Aff. at ¶¶ 13-14; Church Aff. at ¶¶ 28-29).  At the meeting, TCI's Safety Director, Paul Eddins, explained to employees that safety is the highest priority at TCI and that violence is prohibited.  (Eddins Aff. at ¶ 14; Church Aff. at ¶ 29).

On Thursday, May 5, 2005, Gil Love (hereinafter "Love"), TCI's supervisor for the "Under 500 Crew," reported fighting and disruption among the "Under 500 Crew" to Church.  (Garrett Dep. at pp. 159-66; Eddins Aff. at ¶ 15; Church Aff. at ¶ 31).  Fighting amongst the "Under 500 Crew" had been a reoccurring problem for at least two months.  (Garrett Dep. at pp. 163, 168).  The May 5, 2005 incident involved, a member of the "Under 500 Crew," Maurio Pryor.  He alleged that a bolt or screw had been thrown at him and that he had been threatened.  (Garrett Dep. at p. 166; Church Aff. at ¶ 31; Eddins Aff. at ¶ 15).  Garrett heard arguing and Maurio cursing loudly.  (Garrett Dep. at p. 159).  In order to determine the cause of the disruption, Love, Church, and Eddins had consecutive meetings with each of the employees in the "Under 500 Crew," including Garrett.  (Garrett Dep. at pp. 161-65; Eddins Aff. at ¶¶ 16-17;

Church Aff. at ¶ 32).  Garrett was interviewed last.  (Garrett Dep. at p. 162).  Each employee,

including Garrett, denied any knowledge of what had occurred.  (Garrett Dep. at p. 166; Eddins

Aff. at ¶ 17; Church Aff. at ¶ 32).  Garrett told Church that he had heard arguing for about two

months, and that it was mostly horseplay.  (Garrett Dep. at p. 166).

     During the course of the interviews, Church expressed his disappointment to the

employees, including Garrett, for not preventing this potentially dangerous situation from

reoccurring in the "Under 500 Crew."  (Eddins Aff. at ¶ 18; Church Aff. at ¶ 34).  Prior to and

during May 2005, when there was tension, hostility, or violence at the facility, TCI would, in

appropriate situations, implement a disciplinary and safety policy of suspending all employees

involved for a "cool off period."  (Eddins Aff. at ¶ 12; Church Aff. at ¶ 27).  Following each

interview, Church implemented a "cool off period," and instructed each employee, including

Garrett, to "clock out" and go home.  (Garrett Dep. at pp. 162, 171; Eddins Aff. at ¶ 18; Church

Aff. at ¶¶ 32-33).  Garrett testified that Church told him "when you come back, don't come to

work, come to see me.  (Garrett Dep. at pp. 171-72).  Be prepared to talk.  I'll let you know if

you've got a job or not."  *Id*.  Church further indicated that his investigation would resume on

Monday.  (Garrett Dep. at pp. 171-72; Eddins Aff. at ¶ 18; Church Aff. at ¶ 33).

     On May 5, 2005, Church made the following notation in Mr. Garrett's personnel file:

> Mr. Garrett, along with all members of the disassembly line crew, was suspended for the
> remainder of this shift for loud talk, threats, and throwing items at each other.
> They were told to return on Monday - 5/9 and I would sort out the problem and determine
> a solution.  P.E. [Paul Eddins] was in the meeting.

(Church Aff., Ex. 1 at C0065).  Neither Garrett, nor any other interviewed employee was told

that his employment was terminated.  (Def. Brief at p. 14).  Garrett contends that he understood

that he would have a job only if he was willing to confess to knowledge of the incident.  (Pl. Response at p. 5).  Garrett testified that he considered himself fired when he was sent home.  *Id*. at p. 8.

When an employee is terminated at TCI, he is generally told to clean out his locker, and arrangements are made regarding his final paycheck and benefits.  (Eddins Aff. at ¶ 20; Church Aff. at ¶ 37).  Neither Garrett, nor any other interviewed employee was instructed to clean out his locker, and TCI made no arrangements regarding final pay.  *Id*.  On Monday, May 9, 2005, all employees, except Garrett, returned to work.  (Garrett Dep. at pp. 173-76; Eddins Aff. at ¶ 21; Church Aff. at ¶ 38).  Garrett did not return to work on any subsequent occasion.  (Eddins Aff. at ¶ 22; Church Aff. at ¶ 39).  Each returning employee in the "Under 500 Crew" was again interviewed regarding the disruption, and each employee continued his employment at TCI. (Garrett Dep. at pp. 174-75; Eddins Aff. at ¶ 21; Church Aff. at ¶ 38).

In May 2005, TCI's established written attendance policy was that if an employee did not call or come to work for three consecutive days, the employee was considered to have voluntarily abandoned his job.  (Church Aff. at ¶ 40).  Garrett knew that if he was off work he was expected to call in, and that if he was out more than one day he was expected to notify TCI how long he expected to be off work.  (Garrett Dep. at p. 94).  Garrett admitted that he never called back after May 5, 2005, to notify TCI that he intended to return to work.  *Id*. at p. 99.  Garrett understood his employment to have already been terminated because he could not return to work and provide Church with information in regards to the May 5 incident.  (Garrett Dep. at pp. 173, 176).  On May 15, 2005, pursuant to TCI's established policy, TCI determined that Garrett had voluntarily abandoned his employment.  (Church Aff. at ¶ 41).

**DISCUSSION**

**Motion to Strike**

The defendant has moved to strike portions of the plaintiff's "Response in Opposition to Defendant's Motion for Summary Judgment." (Doc. 18). It asserts that the submissions fail to meet the standard set forth in FEDERAL RULE OF CIVIL PROCEDURE 56(e). As previously noted, the plaintiff has not filed anything in response to the motion.

FEDERAL RULE OF CIVIL PROCEDURE 56 states, in pertinent part, that "affidavits" that support or oppose summary judgment motions ". . . shall be made on personal knowledge, [and] shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). "This rule also applies to testimony given on deposition." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). "In considering summary judgment a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form." *Denney v. City of Albany*, 247 F.3d 1172, 1190 n.10 (11th Cir. 2001) (citing *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)); *see McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (otherwise admissible evidence may be submitted in an inadmissible form at the summary judgment stage), *aff'd*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997).

The matter at hand is the deposition of the plaintiff. To the extent that the deposition states facts which the plaintiff had personal knowledge, such as the events on May 5, 2005, the motion is due to be denied. To the extent it contains conclusory statements that are unsupported by personal knowledge, such as "the postings were eliminated so that Mr. Church could more easily place into open positions those he favored instead of attracting and evaluating the best

9

applicants," they are due to be struck.  (Doc. 18 at pp. 3-4).

The plaintiff's lack of personal knowledge requires that the statements be struck because they do not take into account other factors.  By way of example, with regard to the statement regarding the postings, the deposition fails to consider economic and efficiency concerns and merely makes a broad-brush conclusory statement.  Additionally, there is no indication of the basis of the information.  Such is insufficient as a matter of law.

### Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED R. CIV P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his or her case on which he or she bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23; *see* FED R. CIV. P. 56(a) and (b).  Once the moving party has met his or her

burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  *Id*.

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a *genuine* issue for trial."  *Anderson*, 477 U.S. at 249.

## FAILURE TO PROMOTE

### *Prima Facie* Case

The plaintiff first asserts entitlement to relief on the basis of a failure to promote.  To establish a *prima facie* case of racial discrimination under Title VII based on circumstantial evidence, the plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the promotion; (3) he suffered an adverse employment action; and, (4) other equally or less qualified employees who were not members of the protected class were promoted.  *Maynard v. Board of Regents of Div. of Universities of Florida Dept. of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

It is undisputed that Garrett is a member of a protected class (African-American).  TCI

11

does not dispute that the promoted employees were not members of the plaintiff's protected class.  Furthermore, TCI does not contest that the plaintiff suffered an adverse employment action.  Two factors *are* in dispute: whether the plaintiff was qualified for the promotion and the qualifications of the plaintiff and the two promoted employees.

### The Plaintiff Was Qualified for the Promotion and the Company Had a Reason to Consider Him for the Position of Oil Tank Pumper

The defendant asserts that the plaintiff fails to offer proof that he was qualified for or applied for either of the oil tank pumper positions at issue.  (Def. Brief at p. 18).  The defendant cites relevant case law that holds, under certain circumstances, a plaintiff must show that he is qualified and that he applied for the position in question.  *Davis v. NPC Pizza Hut*, 447 F. Supp. 2d 1260, 1268 (N.D. Ala. 2006).  However, the plaintiff correctly asserts that a plaintiff is not always required to have expressed interest in a promotion.  (Pl. Response at p. 11).  A plaintiff can establish a *prima facie* case even where he has not expressed interest in a position where (1) an employer's clear policy of exclusion would make an application a useless exercise or (2) the company had a reason or duty to consider him for the position.  *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1569 (11th Cir. 1986).

The defendant argues that the plaintiff cannot establish a *prima facie* case under either of these standards because the plaintiff has not established that he was qualified for the position of Oil Tank Pumper.  (Def. Brief at p. 19).  The plaintiff asserts that his qualifications for the position included almost eleven years of experience with TCI and a good work history.  (Pl. Response at p. 6).  The plaintiff compares his experience and work history to that of the two promoted workers.  *Id*.  The defendant provides no evidence to counter the plaintiff's assertions

that his experience and work history made him qualified.  Therefore, in viewing the proferred evidence in a light most favorable to the plaintiff, the court finds, based on the evidence presented, that the plaintiff was qualified for the position of Oil Tank Pumper.

The plaintiff contends that Church's clear policy of exclusion made it futile for him to apply for the position.  (Pl. Response at p. 11).  This claim requires two distinct determinations: "that [the nonapplicant] would have applied but for discrimination and that he would have been discriminatorily rejected had he applied."  *Cox*, 784 F.2d at 1560.  Garrett contends that expressing interest to Church about the Oil Tank Pumper position "would have been a futile attempt to undo a fait accompli."  (Pl. Response at p. 11).  The plaintiff cites testimony from his deposition as evidence for this claim.  The plaintiff stated therein that Church "had made his decision and . . . you just don't go contradict him . . . .  That's something you don't do."  (Garrett Dep. at pp. 142-43).  While this testimony may establish that the plaintiff would have been rejected had he applied, it fails to establish that the rejection would have been based on racial discrimination.  Furthermore, the record indicates that Church previously promoted a number of African-Americans to supervisory positions during his tenure as plant superintendent.  (Church Aff. at ¶ 3).  Also, the two previous oil pumpers were both African-American.  *Id*. at ¶ 14.  This evidence necessarily weighs against a finding of a "clear policy of exclusion" to support the plaintiff's claim.  The plaintiff cannot establish a clear policy of exclusion and hence his claim must fail as well on this contention.

The plaintiff also contends that Church had a reason to consider Garrett for the Oil Tank Pumper position.  (Pl. Response at p. 12).  As the Eleventh Circuit stated in *Cox*, when an employer uses "such informal methods" to fill a position, "it has a duty to consider all those who

might reasonably be interested as well as those who have learned of the job opening and expressed an interest." *Cox*, 784 F.2d at 1560.

In this case, it appears that the Oil Tank Pumper position was a higher paying job. (Garrett Dep. at p. 135). Furthermore, Garrett was in fact interested in the Oil Tank Pumper position. Viewing these facts in "a light most favorable to the plaintiff," the court finds that TCI had a duty to consider Garrett for the Oil Tank Pumper position because it was reasonable to conclude that the plaintiff would be and was interested in the job.

### The Promoted Employees, Who Were Not Members of the Plaintiff's Protected Class, Were Equally or less Qualified for the Position of Oil Tank Pumper

The defendant contends that the plaintiff provides no evidence that either Adams or Sweet were less qualified for the oil tank pumper position. (Def. Reply at p. 3). TCI also notes that Church testified in his deposition that Garrett would have had to train for the position. *Id*. However, as stated above, to establish a *prima facie* case of discrimination, the plaintiff needs only to show that other *equally or less qualified employees*, who were not members of the protected class, were promoted. *Denney*, 247 F.3d 1172, 1183. The evidence presented by the plaintiff satisfies this requirement.

The plaintiff had almost eleven years of work experience and a good work history. Neither Adams nor Sweet had over a year of work experience at TCI. The defendant provides no evidence of how Adams and Sweet are more qualified for the Oil Tank Pumper position. Since there is no other evidence of what qualifications are necessary for an Oil Tank Pumper, the court, "viewing the evidence in a light most favorable to the non-moving party," concludes that Adams and Sweet were at most equally qualified for the position as the plaintiff.

14

### Legitimate, Nondiscriminatory Reasons

Having established a *prima facie* case of racial discrimination, the burden now shifts to the defendant to rebut the presumption of discrimination by advancing legitimate, nondiscriminatory reasons for selecting Adams and Sweet for the Oil Tank Pumper positions. The defendant correctly notes, "This is a burden of production, not persuasion." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998). As the Eleventh Circuit has stated, "the defendant's burden is exceedingly light." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004). TCI satisfies this burden of production for both Oil Tank Pumper positions.

The defendant provides multiple legitimate, nondiscriminatory reasons for selecting Adams and Sweet to the Oil Tank Pumper positions. TCI asserts that Adams was hired as oil tank pumper because there was insufficient work for a second full-time oil tank pumper. (Def. Brief at p. 20). The defendant provides evidence that the workload at TCI had been significantly diminishing over the last five to ten years. (Church Aff. at ¶ 10). The record also reflects that Adams only worked approximately 30-32 hours per week. *Id*. at ¶¶ 15 & 17. TCI states that because all current TCI employees were full-time employees, TCI management did not look internally to fill this part-time position. (Def. Brief at p. 20). Instead, the defendant hired Adams to work part-time which was sufficient for the necessary workload. This proffered business and economic reason satisfies the requirement that TCI advance a legitimate, nondiscriminatory reason for hiring Adams to Oil Tank Pumper.

The defendant contends that it promoted Sweet to the full-time Oil Tank Pumper position from the "Over 500 Crew" because the needs of the "Over 500 Crew" had been declining annually. *Id*. at p. 21. Consequently, according to TCI, there was no longer a need for the same

15

number of employees on the over 500 disassembly line.  *Id*.  TCI further contends that it chose to move Sweet to Oil Tank Pumper in order to avoid having to lay off workers.  *Id*.  The defendant also notes that Sweet's former position on the "Over 500 Crew" was not filled.  *Id*.  TCI states that moving an employee from the "Over 500 Crew" to the Oil Tank Pumper position allowed the defendant to train a single worker.  *Id*.  TCI would have had to train two employees if it chose to fill the Oil Tank Pumper position from the "Under 500 Crew."  This business and economic reason proffered by the defendant satisfies the requirement that TCI advance a legitimate, nondiscriminatory reason for hiring Sweet to the full-time Oil Tank Pumper.

### Pretext

By presenting legitimate, nondiscriminatory reasons for the promotions, TCI has rebutted the presumption of discriminatory intent.  In light of this, Garrett must now create a genuine issue of material fact as to whether the reasons advanced are pretextual.  In other words, Garrett must "provide sufficient evidence to allow a reasonable fact finder to conclude that the proferred reasons were not actually the motivation" for the promotions.  *Standard*, 161 F.3d at 1332.  The plaintiff may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proferred reasons.  *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting *Texas Dep't of Community Affairs v. Burdline*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981)).  The plaintiff in this instance fails to create a genuine issue of material fact showing that the defendant's reasons advanced are pretextual.

The plaintiff counters the defendant's business and economic reasons with unsupported

16

conclusory statements.  In order to directly attack TCI's reasons, Garrett must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  This the plaintiff has failed to do.  At no point during the plaintiff's argument does he reference any evidence from the record.  Instead, the plaintiff relies on presumptions and conjectures in his attempt to create a genuine issue of material fact.  That simply is insufficient as a matter of law to overcome the defendant's proffered reasons.

The plaintiff endeavors to illustrate that the defendant's reasons for hiring Adams to the Oil Tank Pumper position were pretextual by advancing arguments supported by insufficient evidence.  Garrett questions why TCI would award a coveted job that paid more than what Garrett earned, to a new employee on a part-time basis.  (Pl. Response at p. 13).  However, this questioning provides unsupported, minimal evidence to counter the defendant's proffered reasons.  The plaintiff advances that the Oil Tank Pumper position is higher paying.  *Id*. However, the plaintiff provides no evidence of the monetary disparity between these positions. Therefore, the plaintiff's suggestion that the monetary disparity between the two positions illustrates pretext is not supported by sufficient evidence.

The plaintiff also claims that the potential presence of favoritism in the hiring of Adams does not eliminate the presence of racial discrimination.  (*Id*.).  Furthermore, the plaintiff elaborates by stating that the presence of favoritism undermines the defendant's claim that Church's decisions were made purely on an economic basis.  (*Id*. at pp. 13-14).  The plaintiff's claim that favoritism undermines the defendant's economic reasons is insufficient.  The plaintiff

is correct in asserting that the presence of personal favoritism does not eliminate the potential presence of racial discrimination.  However, in the alternative, the presence of personal favoritism also does not eliminate the potential presence of a legitimate, nondiscriminatory business and economic reason for the hiring.  The mere fact that personal considerations may have played a role in the selection of a new part-time employee is insufficient to establish that TCI's business and economic reasons are a pretext for discrimination in this instance.  The plaintiff is required to "provide sufficient evidence to allow a reasonable fact finder to conclude that the proferred reasons were not actually the motivation."  *Standard*, 161 F.3d at 1332.  Neither of the plaintiff's arguments against TCI's business reasons for hiring Adams is supported by sufficient evidence to overcome the defendant's motion for summary judgment.

The plaintiff also attempts to undermine the defendant's reasons for promoting Sweet to the full-time Oil Tank Pumper position by asserting that his "own work history demonstrates that workers were easily shifted back and forth among the various crews."  (Pl. Response at p. 13). The plaintiff then presumes that "it would have been very easy to have transferred a worker from the Over 500 Crew . . . to the Under 500 Crew, while sending a member of the Under 500 Crew to the Oil Tank Pumper position."  *Id*.  However, the plaintiff offers no evidence from the record that supports his conclusion that Garrett's work history demonstrates that workers were easily shifted back and forth among the crews.  While the record does contain references to Garrett's work history, it is silent as to the relative hardship required in moving from one crew to another. Naked assertions are not evidence of pretext.  *See Standard*, 161 F.3d at 1332.  Based on the lack of evidence provided, Garrett's attempt to create a genuine issue of material fact for TCI's failure to promote the plaintiff to the Oil Tank Pumper position filled by Sweet must fail.

**Retaliation**

The plaintiff next asserts entitlement to relief on a basis of retaliation.  The defendant argues that the plaintiff did not engage in a statutorily protected expression.  To establish a *prima facie* case of retaliation under § 1981, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and, (3) the adverse action was casually related to the protected expression.  *Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006).

To engage in statutorily protected expression, a plaintiff must show he had a good faith, reasonable belief that the employer was engaged in an unlawful unemployment practice and that his belief was objectively reasonable in light of the facts and record presented.  *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  In this case, the plaintiff fails to establish either component of this factor.  More importantly, the plaintiff fails to explain how his claimed statutorily protected expression was based on race, color, religion, sex, or national origin, which Title VII requires.

The plaintiff claims that he engaged in statutorily protected activity when he refused to lie about the May 5, 2005 incident.  (Pl. Response at p. 14).  Church's investigation involving the bolt throwing incident on May 5, 2005, obviously is not inherently an unlawful employment practice.  Furthermore, the plaintiff offers no references to the record that illustrate that he subjectively believed that Church's actions on May 5, 2005, were unlawful.  *See Little*, 103 F.3d at 960.  Therefore, the plaintiff fails to satisfy the subjective component of the statutorily protected expression factor.

Even if Garrett established the subjective component of this test, he fails to prove that his

belief was objectively reasonable in light of the facts and record presented.  Under *Little*, "the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.  *Little*, 103 F.3d at 960.  The record reflects that "cool off" periods were a common business practice at TCI and that the plaintiff had been sent home early before for "cool off" periods.  (Church Aff. at ¶ 27).  Furthermore, the fact that all six other employees interrogated about the incident returned to work the following Monday greatly weakens Garrett's argument.  The record in this case, viewed in a light most favorable to the plaintiff, illustrates that Garrett's alleged belief was not objectively reasonable.  Since the plaintiff cannot establish that he engaged in statutorily protected activity, the plaintiff's claim for retaliation under § 1981 must fail.

## CONSTRUCTIVE DISCHARGE/HOSTILE WORK ENVIRONMENT

In the defendant's motion for summary judgment, the defendant addresses potential claims for constructive discharge and hostile work environment.  (Def. Brief at pp. 22-30).  The plaintiff's response in opposition to the defendant's motion correctly asserts that these claims have not been asserted by the plaintiff.  (Pl. Response at p. 15).  Accordingly, there is no need to further address such claims.

## CONCLUSION

Based on the foregoing, the court finds that the defendant's motion to strike (doc. 18) is due to be granted in part and denied in part and the motion for summary judgment (doc. 14) is due to be granted in its entirety and the plaintiff's complaint dismissed with prejudice.  An appropriate order will be entered contemporaneously herewith.

**DONE**, this the 2nd day of January, 2008.

_John E. Ott_
_____
**JOHN E. OTT**
United States Magistrate Judge